DERMOTT DRAINAGE DISTRICT *v.* CHERRY.

4-9226                                    233 S. W. 2d 387

Opinion delivered October 30, 1950.

*Will J. Irvin* and *Edwin E. Hopson, Jr.*, for appellant.

*Gibson & Gibson*, for appellee.

GRIFFIN SMITH, Chief Justice. Trustees of the W. R. Cherry estate joined with Roy Morrison in an action against Dermott Drainage District, and Drainage District No. 4.[1]

In November, 1947, each District approved by resolutions certain work the United States proposed to do under authority of § 2 of the Flood Control Act of August 28, 1937, as amended. It was stated that Big Bayou Slough should be opened and cleared "to take care of the flood waters flowing or emptied thereinto." The Districts agreed to provide without cost to the Federal Government the necessary lands, with a guarantee against damages, and to maintain the system in accordance with regulations prescribed by the Secretary of War under terms of the Flood Control Act of June 22, 1936, or similar legislation.

---

[1] In appellants' brief it is stated that Drainage District No. 4 is erroneously referred to in the complaint as Black Pond District No. 4; that this District is wholly within Desha County, and that no part of Dermott Drainage District is in Desha, but is principally in Chicot County. An engineer's blue print, filed as an exhibit, shows Black Pond Slough. Throughout the testimony there are references to "Black Pond," and "Black Pond Slough," and what the complaint mentions as Black Pond District No. 4 may have been used as interchangeable expressions.

The complaint alleged that clearing and excavation work incident to reconditioning of Big Bayou Slough would not be a completed drainage undertaking when finished according to plans supplied the Government's contracting firm;[2] that unconfirmed promises for additional work had been made by Government agents who had authority to make them, but even so, the promises were vague and indefinite. It was finally alleged that the Districts were without sufficient funds to adequately compensate landowners for increased damages they would sustain, hence the Commissioners were misinformed when they adopted the resolutions.

About twelve years before the trial of this case in September, 1949, considerable drainage work was done in a part of the area here involved when the Federal Government undertook to reclaim approximately 10,000 acres of overflow land partially drained by Big Bayou, or Big Bayou Slough. The bayou's course is generally north and south, and it lies mostly in Desha County, but partly in Chicot. There is testimony that in connection with this work ditches spoken of as laterals were cut. W. H. Bynum, who personally owned 700 acres just east and north of Dermott, and who held stock in a corporation that owned 2,500 acres in Chicot County, and an equal amount in Ashley County immediately west, testified that before the laterals were cut, Big Bayou served as a reservoir or receiving place for all of these lands and its general utility for this purpose was reasonably satisfactory except when extreme floods came. With completion of the Government's reclamation project, adjacent lands began to get "a considerable amount of water."

When the appellant drainage districts passed their resolutions in 1947 authorizing Government work, the contractor started dredging and snagging at a point where Black Pond Slough empties into Big Bayou, not far from Bellaire, and proceeded north. The northern extremity of Ditch No. 4 is a mile or more north of Highway No. 4, on or near Sec. 30, Township 12 South,

[2] Delta Drainage Company contracted with the Government to do the work mentioned in the specifications upon which the bid was predicated.

Range 4 West, in Desha County, and slightly more than two miles west of McGehee. Dermott Drainage District is approximately 22 miles long.

The landowners as appellees, in whose favor the Chancellor granted a restraining order, say that the construction complained of consists of eleven miles on the upper reaches of Big Bayou. A question asked by one of the attorneys for appellees and the answer indicate that assessed benefits against the Dermott District "were based upon a ditch extending from just east of the Missouri Pacific's tracks north of Dermott and extending south" beyond the lands owned by those who are complainants here. In the course of trial where testimony was heard *ore tenus* by the Chancellor, many references were to a map filed as plaintiffs' Exhibit No. 2, but the method of identification was not such as to bring into the record the places pointed to. For this reason we must assume that in this respect the trial Court was better informed as to landmarks, relative distances, and related matters not susceptible of determination here through answer of witnesses who were looking at places indicated, but not named for the record.

But generally it appears that Big Bayou Slough was originally utilized by the Dermott District in Chicot County. An inset map shows the slough as beginning west of McGehee, extending south past Masonville, but west of that town, veering east in Sec. 29 in Chicot County, then southeast and south to its confluence with Black Pond Slough. An engineer's drawing shows a line beginning more than a mile west and a little north of where the two sloughs join. It passes through Dermott and extending northward parallels "Ditch No. 4," *terminating* more than two miles west of McGehee. It is marked, "Channel Clearing and Snagging," and the distance is indicated as 11.6 miles.

Appellees contend that much of the Government work is new construction in that the bayous and original ditches are being widened and deepened. The defense answers that fresh soil near the old embankments was used as a foundation or base for machinery operating

within the original confines and that it has been mistaken for new structure. It is also contended that because of imperative economy when the original work was done, stumps and an occasional tree were left. Dermott District was created in 1915 and its bonds have been paid. The dredge boat used in building the ditch was constructed slightly east of the Missouri Pacific Railroad in Section 29, township thirteen south, range three west, Chicot County. But a witness for the protesting landowners testified that the point so described "was the most northern point of Big Bayou Slough *that was dug at that time.*" This testimony adds confirmation to the general trend of discussions by witnesses who thought the bayou was a part of the drainage ditch system. R. W. Parrish, Chancery Clerk, testified that the organization papers affecting the Dermott District were not on file with other records relating to the undertaking, and that a diligent search for them was unavailing.

Appellees confine their complaint to that part of the Government work on the upper limits of Big Bayou. Six miles of the work is in the Dermott District. It follows that if appellees are correct in stating that the Dermott District "lies within Chicot County, with no part of it in Desha," the litigating parties are not in disagreement on this point. But in designating the injury occasioned by District No. 4, (or, as the brief says, "Black Pond District No. 4") appellees describe it as being immediately north of the Dermott District within Desha County. They also say that "five miles of said work has been and will be done in this District." They further complained that the 11.6 in mileage "of continuous work" would connect with District No. 4.

Testimony varied regarding the actual work that was being done, and witnesses for the plaintiffs did not all agree. D. W. Nall, a Chicot County Road Supervisor, thought that near the Crenshaw dump on the Bellaire road paralleling Big Bayou the ditch would be 40 feet wide at the top, 20 feet at the bottom, and four feet deep,

834

with a 15-ft. berm.[3] Another witness testified that there had never been a "dug ditch" up Big Bayou beyond where the Missouri Pacific crosses [Big Bayou] north of Dermott; but this same witness said that he had, to some extent, privately drained his own land, and for that purpose had caused a ditch to be dug measuring 24 feet at the top and 16 feet across the bottom, "emptying into this new ditch." Indicative of the uncertain character of testimony affecting terrain in its relation to the original projects, one witness for plaintiffs was asked: "How far [are] Big Bayou Lake and Big Bayou Slough from the southern end of Ditch No. 4?". A. "It is approximately a mile, I think." Q. "What type of drain did you have from the southern end of Ditch No. 4 over that mile to Big Lake Bayou?" A. "That *was* Big Lake itself—from the end of it down to the bayou. I have always called it slough." But, said this same witness, the northern end of Big Bayou Slough where it connects with Ditch No. 4 "from bank to bank is tolerably wide. That's been a long time ago, but I would judge it was 60 or 70 feet— that is, where the ditch empties into the slough. The banks were natural, and not man-made."

G. M. Jones, a commissioner for the Dermott District, interpreted the resolution he participated in procuring as a request that the Government "snag and clean out" Big Bayou *ditch* up to the county line. The purpose was to facilitate drainage and save the taxpayers. In doing the work the contracting firm used a large tractor with bulldozer for leveling purposes—"taking off the spoil—that is, the old ditch bank." The result was a usable roadway. This work, incidentally, could create an honest though erroneous belief that the ditch was being widened. The course of the ditch, the main channel, had not been changed, and no laterals were dug. The contract called for dredging "the lower part on down as far

---

[3] "Berm," or berme, is defined as a narrow ledge; specifically, a *fort.*, a space of ground or a terrace [varying in width] left [in olden times] between the rampart and the moat or foss, designed to receive the ruins of the rampart in the event of a bombardment and to prevent the earth from filling the foss. The term is now generally used to designate the bank or side of a canal, and in practice has been somewhat broadened to include other forms of construction.

as the District goes.'' The same dredging firm had a contract ''for clearing ·trees and brush and everything out of Big Bayou Slough.'' The witness knew, from personal observations, that ''since that clearing—when the contract was first let at that time—there were big trees in the bayou: overcup [4] or other species that grew like that. After these were cleaned out smaller [timber] grew [where the clearing had occurred] and the flowage was retarded. The present contract contemplated clearing these impediments to flowage.''

There had been testimony (J. B. Griswood for the plaintiffs) that the old ditch (that part not dredged, etc.) ''after it came to the fork up there—naturally the old ditch is smaller than that cleaned up.'' He thought that originally the southern end of the drainage system was larger than the northern reaches, but since the ''reworking'' there was not much difference. But, said he, in the ''new ditch all the undergrowth is cleaned out and the old ditch has grown up. The saplings.are as big as my leg, and I couldn't say how many drifts there are in it, but there is one [in particular] right at the bridge.'' Mr. Griswood was also of the opinion that ''the ditches'' were not large enough to take care of water that might normally be anticipated, but ''this new ditch will put the water anywhere from 12 to 14 inches deeper than before the construction. This is my observation, or sense.''

On the question whether the work complained of was new construction or maintenance, plaintiffs' witness Nall testified that ''with that new ditch in there—with a clean channel and as large as it is—you are bound to get more water and get it quicker on the Crenshaw dump. This will keep [the public road] under water longer, and [the water will reach it quicker] than it would if that ditch had never been dug, because it had grown up. Possibly some of the water up there did come from above the county line, but [the ditch or bayou] grew up to such an extent that, you might say, the water had to seep down —it came gradually. But now, with that open channel,

---

[4] A timber.tree of the southern United States, with acorns deeply immersed in the cups; also, any of several other species of this character, as the bur oak.

there is nothing to [retard] the flowage in full force. When you get down to the end where the old ditch has grown up, it hasn't been cleaned out and the [increased] water can't get away. It is going to cover up the road deeper than before.''

Aside from the decree, the Chancellor gave a lengthy opinion that is very helpful to this Court, and is a practice to be commended. It was found that irrespective of any drainage laws allowing districts to clean and recondition ditches, the evidence disclosed that effect of the work done—whether new or maintenance (the point was not decided)—would be to accelerate flowage, and since the lower uncleaned drains were not large enough to care for increased waters from flash-floods or from prolonged rains, consequence of what was being done was the taking of private property for public use, without just compensation. District No. 4 had between $5,000 and $6,000 in its treasury, while the Dermott District's balance was around $11,000. Property damages as estimated would be substantially in excess of these combined figures, although on this question the court did not make a specific finding.

We agree with the Chancellor that testimony preponderated in favor of the conclusion that more water would reach the area near Bellaire faster because of the work done, and that landowners below the juncture and perhaps for some distance above it within backwater areas would sustain damages. However, the decree points out that the work had been ''practically completed'' when the trial was had, and the Court properly declined to discuss ''damages that might have happened and that might have been stopped'' while the work was in its early stages. The injunction against the two districts merely restrained the Commissioners from doing anything else in carrying the project forward. The Federal Government and Delta Drainage Company were left untouched, hence the work continued to its completion insofar as the restraining order affected it.

We do not pass upon matters not decided by the lower court except where judicial notice supplies the

omission, therefore we do not say whether the work could have been done under Pope's Digest, § 4481—Ark. Stat's, § 21-533. It does not appear that Drainage District money was spent in any manner, but on the contrary the two commissions merely undertook to comply with Federal requests for protection under the Flood Control Act. The suit was not for damages against the commissioners for acts so obviously distinct from their powers as agents for the districts as to render them personally liable, nor were the districts asked to make restitution. The Chancellor appropriately declined to "freeze" the treasury funds held by each district, and only issued a restraining order that operated against something that in effect had been virtually finished.

Our conclusion is that the injunction came too late. At the time issued it could not serve a practical end, because the commissioners, respecting "further activity in connection with the project," were little more than onlookers who had satisfied the Government's primary requirement nearly two years before.

It is in evidence that plans were afoot—depending upon Congressional appropriation of funds for work already authorized—to extend, either by enlargement or dredging and snagging, the lower reaches of the Dermott District.

A gentleman's agreement between Congressmen and Senators from Arkansas and Louisiana was delaying the upper work until Louisiana had taken steps to care for additional water. It is our view that the drainage commissioners should not be restricted by an injunction affecting their conduct in 1947 when the primary interest of those complaining involves an enlarged outlet below Bellaire, and to the lower extremities of the Dermott District. If in undertaking to accomplish the improvements hinted at the commissioners should exceed their legal authority, then by expeditious application entire relief could be obtained.

In the present state of transactions, as reflected by the record here, jurisdiction for redress from damages

already occasioned, if such resulted from illegal acts, would be in Circuit Court.

The restraining order will be dissolved, and the cause remanded with directions that the actions be dismissed if, upon a finding by the Chancellor, the work has been completed from a practical standpoint.